## MEIGS *v.* BROMLEY.

Bills and Notes — Consideration — Indulgence — Collateral Security—Subrogation.

Plaintiff sold a lumber business to one of the defendants, who, as a part of the consideration, agreed to pay certain notes given by him for plaintiff's accommodation, and bearing his indorsement. The bank holding the notes refused to extend

them, and threatened suit unless "live paper" should be given in their stead; whereupon an arrangement was made by which said defendant paid one-half of each note as it matured, and gave the note of himself and co-defendants for the other half. As each of the latter notes fell due, it was paid by check; a new note for a like amount being given by defendants, and the proceeds placed to their credit. This course was continued for some four years, during which time no effort was made to collect the notes indorsed by plaintiff, and they were not carried on the books of the bank as part of its assets, while defendants' notes were so carried. Subsequently judgment was obtained against plaintiff on his indorsement, which he paid, and then sued defendants on their notes, claiming to have become subrogated to the rights of the bank. *Held*, that such notes were supported by a sufficient consideration, and that defendants were liable thereon.

Error to Mecosta; Palmer, J. Submitted June 4, 1902. (Docket No. 1.) Decided September 17, 1902.

*Assumpsit* by Arthur Meigs against Enoch Bromley, Mahlon Carman, and J. Herbert Childs on certain promissory notes. From a judgment for defendants, plaintiff brings error. Reversed.

*C. H. Gleason* (*Arthur Lowell* and *John T. Clark*, of counsel), for appellant.

*A. B. Cogger* and *M. Brown* (*Frank Dumon*, of counsel), for appellees.

MOORE, J. This suit was commenced by declaration, which, omitting the formal part, states in substance as follows: That plaintiff and one Richard G. Peters, during the years 1890 to 1894, were partners doing business under the firm name of Arthur Meigs & Co. It averred the assignment by that firm and by Mr. Peters to the plaintiff of the claim in controversy; that Arthur Meigs & Co., prior to October 1, 1890, were engaged in business, which business was under the care of defendant Mahlon Carman, and on the 1st day of October, 1890, Meigs & Co. sold its business to said Carman, who in part consideration agreed

to pay all the indebtedness pertaining to the said business; that he would pay, as they matured, certain notes, aggregating $10,000, made by said Carman, indorsed by said Arthur Meigs & Co., owned by the Big Rapids National Bank, and would protect Meigs & Co. from said notes and their indorsement thereof; and in pursuance of said agreement the said Carman did afterwards pay to the said bank one-half of said notes as they matured by paying one-half of each of said notes as it matured, and for the amount of the other half of said notes the said Carman gave said bank the notes of the said defendants herein as collateral security for the payment of the other half of said notes, which notes defendants have never paid, and because of such nonpayment the bank sued Meigs & Co. and the said Richard G. Peters as a member of said firm of Arthur Meigs & Co. for the said unpaid deferred half of said notes, and recovered judgment against the said Richard G. Peters and said plaintiff for the amount unpaid on the said notes, which judgment the said plaintiff has been compelled to pay, and because of said payment plaintiff became subrogated to the rights of said bank in the said notes of said defendants herein, and became the owner of said notes, and entitled to bring suit thereon.

Other details of the situation were set out in this count, and an averment of damages was made. Then followed all the common counts in *assumpsit*, with an *ad damnum* clause attached. Then followed a notice that, under the money counts, two notes would be given in evidence, copies of which were attached. One of the notes reads as follows:

"$2,359.52.          Big Rapids, Mich., Oct. 30, 1894.

"Ninety days after date we promise to pay to the order of M. Carman twenty-three hundred and fifty-nine and 92-100 dollars at the Big Rapids National Bank of Big Rapids, Mich., value received, with interest at eight per cent. per annum.

"Bromley, Carman & Childs, M. C."

Indorsed on the back, "M. Carman."

The other note read the same except the date and amount.

The defendants pleaded the general issue, and gave notice of special defenses. The defendants Bromley and Childs each filed an affidavit denying the execution of the notes. After the testimony was all in, plaintiff's attorney asked the judge to direct a verdict in his favor. The judge declined to do so. The plaintiff requested the judge to give a large number of requests to charge. He declined to do this, except as he covered some of them in his general charge. The case was submitted to the jury, which returned a verdict in favor of defendants. The case is brought here by writ of error.

A great many assignments of error are presented and argued by counsel. We do not deem it necessary to discuss many of them. The facts are not at all complicated. Prior to October, 1890, Mr. Carman was employed by Meigs & Co. This company was composed of Mr. Meigs and Mr. Peters. For the purpose of getting funds for their use, Carman had made eight notes, aggregating $10,000, which were indorsed by Meigs & Co., and were discounted at the Big Rapids National Bank. In 1890, Meigs & Co. became embarrassed, and about the 1st of October sold their business to Carman, he agreeing, among other things, as part of the consideration for the sale to him, to pay the eight notes before mentioned. He paid half of the amount due on them in cash, under circumstances which will appear later. The bank later sued the notes, and got a judgment, which was affirmed in this court. The case is reported as *Big Rapids Nat. Bank* v. *Peters*, 120 Mich. 518 (79 N. W. 891). A reference to that case will help to understand this one. After that case was decided, Mr. Peters paid the judgment, and assigned his interest in it and the claim against the defendants in this case to the plaintiff herein.

Upon the trial of this case Mr. Carman testified, among other things:

"The firm of Arthur Meigs & Co. was composed of Arthur Meigs and Richard G. Peters. At the time of Peters' failure these notes were all in the bank. I saw Meigs just before then. I was in Grand Rapids. Mr. Meigs proposed to me to turn over the Mecosta business to me by my paying the Arthur Meigs & Co. indebtedness at Mecosta, and that was consummated in that way that afternoon. The first time I went to the bank—the next day or two after Mr. Peters failed—I asked Mr. Comstock if he would extend the time of this paper by my paying a portion of it when it became due and the balance some time in the future, and he said he could not accept it in that way; that I could pay whatever I could, but he could not extend any time, or have any extension of time; and I asked him if I could use the paper of Mr. Childs and Mr. Bromley with myself as the maker, and take up the balance of this paper, and he said I could not. I told him that I had not made any arrangement with Mr. Bromley and Mr. Childs to that effect, but thought I could. He said it would not do any good, that I could not do it that way, but, if I could get Mr. Bromley and Mr. Childs to sign papers or notes that they could carry in the bank in the place of the Peters paper, that he would allow me to do it. I told him I would go home and try and make that arrangement, and then went home, as near as I can state. When I asked Mr. Comstock to accept this paper, he would not take it only to carry in the bank as live paper in place of the Peters paper, as he claimed that after they had carried past-due paper a certain length of time—I think it was six months—it would have to be charged off, and he would certainly have to sue us, or do something, if some such an agreement was not made. He would not let me have the Peters paper unless I would pay it in full. I tried to get the paper at that time, and tried hard, and he would not let me have it.

"Q. Whether anything was said between you and the bank president or the bank cashier about the rights of the bank to sue upon this Peters paper?

"A. They always claimed they had a right to sue on it, and should sue on it.   *   *   *

"At the time I was talking with the president and cashier, I wanted to make an arrangement whereby I could take care of this original $10,000 of Arthur Meigs & Co., as I had agreed to. I could not pay it all as it fell due, but thought I could along in the future, if I could get an

extension of time; and I asked Mr. Comstock if I could make that arrangement with him, make that arrangement with Mr. Bromley and Mr. Childs to help me out in the indorsement or the signing of these notes. Mr. Comstock would not agree to it, but in our conversation, and telling them what I thought I could do, they said that, if I could get Childs and Bromley to make paper that they could carry in the place of the Peters and Meigs, paper in their bank, with the understanding that there should be no extension of time on the Meigs and Peters paper, and that they still held and would hold Mr. Meigs and Peters responsible,—they would not accept this paper as part payment, or they would not accept the paper as an extension, but they would accept it and carry it in the bank as live paper; and then went on and gave the reason which I stated before,—something about the bank could not carry past-due paper only such a length of time, and it would have to be charged off, and, if it came to that, they would certainly sue me for it if I didn't do something of the kind. So I went to Mecosta, and got Bromley and Childs to go up there with me, and talked it over with them, and they said they would do anything in reason that they could do, and they went up there, and we finally made an arrangement · in that way as the bank proposed, and took the Bromley and Childs paper to carry in the bank, as they stated, as live paper in place of the Peters paper.

" _Q._ State how much you put in as these notes matured.

"_A._ ' As each note matured I gave the bank one-half the amount of the Arthur Meigs & Co. paper in cash, and put in Bromley, Carman & Childs paper for the other half.

\* \* \*

" _Q._ Had they told you before that, if you would get Mr. Bromley and Mr. Childs with you, they would not sue you?

"_A._ They did not tell me they would not sue me.

" _Q._ They told you, if you would get them, it could run? '

"_A._ They didn't say so; no, sir.

" _Q._ They would carry it in place of the other indebtedness?

"_A._ Yes, sir.

" _Q._ And these Bromley, Carman & Childs notes were for the half of that original indebtedness?

"_A._ Yes, sir; and as each Arthur Meigs & Co. note matured I put in a Bromley, Carman & Childs note for identically one-half of that note, and as each Bromley,

Carman & Childs note became due they sent me notice that note would be due at a certain date, and I paid that note when it became due by check, and either paid the discount at the time I put it in or took it up.   *   *   *

"Bromley and Childs went with me to the bank at the time the arrangement was made before any notes were given,—the second time I went.   I was engaged with them in business at the Soo.   I was myself carrying on the old Arthur Meigs & Co. business at Mecosta.   I did not keep a separate bank account for myself and for Bromley, Carman & Childs.   It all went into my bank account.   The business was done in the name of M. Carman except from June 1, '91, to October 20, '91, when it was done in the name of M. Carman Shingle Co.   All the business I had anything to do with was done in that way.   Business at the bank was done under the name of M. Carman Shingle Co. from first of June to last of October.   After that it was in the name of M. Carman."

Mr. Bromley testified to substantially the same state of facts as did Mr. Carman.   On the cross-examination, among other things, he said:

"Mr. Comstock said that the notes he held of Peters & Co. or Meigs & Co. and Carman were good; that he could collect on them.   They had just failed, as I understand it; he knew it, and we knew it, and it was talked over there. I do not know whether he meant that he could collect of Carman.   We were to put our notes in there to carry one-half of the Arthur Meigs & Co. paper until that paper was paid, and it was agreed there between us and Mr. Comstock that Mr. Carman should give those notes in that way, and sign all with the firm name of Bromley, Carman & Childs.

"Q. Didn't you understand, at the time you gave this paper, or consented that he should give it, that it would save suit being brought against Mr. Carman on the old notes?

"A. I think there was something to that effect.   Mr. Carman was in business with us at that time in the Carman Shingle Co. business.   The difference in the business he had been carrying on for Mr. Meigs and our business was he bought and sold, while we manufactured and sold. Mr. Comstock said he would take the new paper, but he would not give up the old paper; that he would simply hold it there.

"*Q.* Did he say he did' not want to give up his old security, but he would take this additional security?

"*A.* He said he would not give up the old paper.

"*Q.* But he would take this?

"*A.* He would take this paper to carry as live paper in the bank.

"*Q.* To represent the same indebtedness?

"*A.* I suppose so. I did not sign any of the first Bromley, Carman & Childs notes that were given. That was all left for Mr. Carman to do. I think I did sign one when Mr. Carman was away, along in 1891, I think."

Mr. Childs was also sworn as a witness, and told substantially the same thing. On the cross-examination, among other things, he said:

"*Q.* You made an arrangement there, and put your paper in for one-half the old Meigs & Co. paper as it matured?

"*A.* I suppose that is the way Mr. Carman was to use it at proper times.

"*Q.* It was talked about and agreed upon at that time?

"*A.* Yes, sir.

"*Q.* And agreed that he should put that paper in?

"*A.* Yes, sir.

"*Q.* He was to sign it how?

"*A.* I suppose as Bromley, Carman & Childs.

"*Q.* Was that talked about?

"*A.* Yes, sir.

"*Q.* It should be signed that way?

"*A.* Yes, sir.

"*Q.* That paper was to be carried in that way until the other paper was collected?

"*A.* He didn't say that. It was to be carried as live paper on the books. He didn't say anything about that at all.

"*Q.* It was to be carried as live paper on the books?

"*A.* He said all the time that the other paper was good, though; that he should get his pay out of the other paper.

"*Q.* That he could get his pay?

"*A.* Yes, sir.

"*Q.* Now, just tell us what he said about liability upon that paper.

"*A.* Who was liable?

"*Q.* On the paper that you gave.

"*A.* He didn't say anything.
" *Q.* He said nothing?
"*A.* No, sir.
" *Q.* Did Mr. Comstock say anything about any liability on this new paper you were to give?
"*A.* No, sir.
" *Q.* Did either of the Comstocks say anything?
"*A.* No, sir. They were relying on the other paper to get their pay. That was the way they talked all the way through, and we thoroughly understood it that way.
" *Q.* You understood they could collect on the other paper?
"*A:* Yes, sir.
" *Q.* But the matter of your liability on this paper was not discussed at all?
"*A.* No, sir."

He modified this statement by saying the Comstocks did not understand these notes were to be paid. The version of the bank officers of the transaction was not given.

A large mass of correspondence between the bank and Mr. Carman was put in evidence, which shows that, when a Bromley, Carman & Childs note became due, their note for a like amount was sent to the bank, with a request that it be discounted and credited, and a check for the amount due on the maturing note was inclosed, with a request that it be received as payment of the maturing note, which note was canceled, and sent to Mr. Carman. This course was continued from October, 1890, until October, 1894, when the two notes involved here were given, and all the other Bromley, Carman & Childs notes were surrendered.

We do not deem it necessary to express any opinion as to whether the oral testimony was competent or not, nor to decide whether certain portions of the charge were proper. There was no ambiguity about the letters. When the testimony was all in, there was no doubt about the authority of Mr. Carman to make these notes. Carman, Bromley, and Childs were all present when the arrangement was made that he should put these notes in the bank just as he did do. It is impossible to read the record

without reaching the conclusion that the bank was insisting upon the notes given by Carman and indorsed by Meigs & Co. being paid or sued, or that live paper should be given in the place of them. For reasons best known to themselves, Bromley and Childs did not want Mr. Carman sued, and came to his assistance. The result was that Mr. Carman paid one-half of the amount of the notes indorsed by Meigs & Co., which Carman had agreed to pay, in cash, and put in the bank Bromley, Carman & Childs notes for the other half; and the bank carried the Meigs & Co. notes for upwards of three years without requiring any further payment to be made upon them or suing them, and for more than three years discounted the notes of the defendants, crediting the amount, and receiving checks in payment of the maturing notes. After the Bromley, Carman & Childs notes were put into the bank, the notes indorsed by Meigs & Co. were not carried on its books, but the others were, as live notes, and part of the assets of the bank. Under these circumstances the defendants cannot now be allowed to say they incurred no liability by giving these notes. The judge should have directed a verdict in favor of the plaintiff, as requested. *Calkins* v. *Chandler*, 36 Mich. 320 (24 Am. Rep. 593), and the cases there cited; *Aultman & Taylor Co.* v. *Gorham*, 87 Mich. 233 (49 N. W. 486); *Gumz* v. *Giegling*, 108 Mich. 295 (66 N. W. 48).

Judgment reversed, and new trial ordered.

HOOKER, C. J., GRANT and MONTGOMERY, JJ., concurred.